**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0165n.06
Filed: February 26, 2009

Nos. 07-3086, 07-3087, 07-3115

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ABRAR HAQUE, AKRAM HAQUE, and | ) | NORTHERN DISTRICT OF OHIO |
| ABDUR RASHID, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE:    MERRITT, ROGERS, and WHITE, Circuit Judges.

**MERRITT, Circuit Judge**.  The government's theory of this criminal case at trial was that defendants-appellants Abrar Haque ("Abrar"), Akram Haque ("Akram"), and Abdur Rashid ("Rashid," collectively "defendants"), as members of an accounting firm, were in the business of helping people hide cash, conceal income, or overstate income.  After a three-week trial, defendants appeal their convictions for RICO conspiracy, conspiracy to defraud the United States, money laundering, making and subscribing false individual income tax returns, and numerous other crimes. They raise ten different claims, some with multiple subparts.  We do not find any error that would justify reversal.

**BACKGROUND**

1

Abrar Haque, then a certified public accountant, owned and operated the accounting firm Abrar CPA, Inc., also known as "ACI," which is the focal point of this case. The firm had individual and corporate clients. At various times, Akram Haque and Abdur Rashid worked at the firm under the direction of Abrar. Akram generally handled accounts dealing with corporate and sales taxes, while Rashid handled city taxes for businesses and individual clients. Rashid was also an imam and gave religious instruction at the Al Ihsan School, a local Islamic school run by Abrar.

The criminal investigation of the firm began when Mohammed Hassan Luftawi, a convicted felon seeking a sentence reduction for government assistance, informed the FBI that the firm produced false tax documents for a fee, and that he himself obtained such documents on one occasion. To substantiate the claim, Luftawi introduced the FBI to his friend Mohammed Abdelqader ("Abdelqader"), who offered to approach the firm (at the direction of the FBI) about getting false documents. In March 2003, at the FBI's direction, Abdelqader visited the firm and asked Abrar to prepare a tax return for his business for the 2002 tax year. In private, Abdelqader informed Abrar that he wanted to understate his earnings to minimize tax liability. Abrar obliged and ultimately produced a tax return with artificially reduced numbers for gross receipts, cost-of-goods-sold, and other inputs. In the summer of 2003, the FBI had Abdelqader approach Abrar for help laundering allegedly off-the-books cash income. Following initial talks, Abdelqader and Abrar engaged in four cash-for-check transactions, transpiring between December 2003 and August 2004. Over the four transactions, a total of $330,000 in cash was exchanged for $300,000 in checks, the remaining $30,000 being Abrar's commission. The cash was provided by the FBI, but Abdelqader told Abrar that it came from the sale of contraband cigarettes from North Carolina.

2

Around this time, the FBI obtained court authorization for electronic surveillance of the firm's telephone and fax lines, and Abrar's cell phone. Near the end of the investigation, the FBI obtained search warrants for Abrar's home, a bank safe-deposit box, several offices used by Abrar at the Al Ihsan School, and the firm's premises. During the search of his home, Abrar consented to an interview with an FBI agent in which Abrar made several false statements. The criminal investigation revealed that Abrar's and the firm's fraudulent business practices extended beyond their interaction with Abdelqader. Evidence showed that on multiple occasions, for a small fee, the firm created false documents which purposefully over- or understated payroll or individual income for the purposes of avoiding applicable taxes, obtaining government benefits, or securing bank credit and loans.

On February 1, 2006, the grand jury returned a 79-count superseding indictment charging fifteen individuals. It charged Akram and Rashid with RICO conspiracy, conspiracy to defraud the United States, and making and subscribing false individual income tax returns. It charged Abrar with the preceding crimes as well as conspiracy to launder money, money laundering, fraudulent misuse of visas, making and subscribing false tax returns for the firm and the Al Ihsan School, wire fraud, mail fraud, bank fraud, healthcare fraud, interstate transportation of property taken by fraud, and making false statements to a federal officer. Trial commenced on September 26, 2006. On October 16, 2006, the jury returned guilty verdicts on all but three counts. On January 9, 2007, the district court sentenced Abrar to 144 months' imprisonment and three years' supervised release, Akram to 30 months' imprisonment and three years' supervised release, and Rashid to 27 months' imprisonment and three years' supervised release.

## DISCUSSION

3

## I.  MOTION TO DISMISS SUPERSEDING INDICTMENT

Before trial, defendants moved to dismiss the superseding indictment, alleging selective prosecution, entrapment, outrageous government conduct, and defects in the search warrant of Abrar's home.  Evidence in support of the motions was scheduled to be heard at a pretrial hearing.  At the opening of the hearing, however, defendants waived their right to present evidence and instead asked the court to decide their motion on the pleadings.  Thereafter, the district court denied the motion from the bench, explaining that "there is not one bit of evidence that has been presented to this Court to support any of those characterizations of the conduct, negative conduct, allegedly, by the Government in this case."  Suppression Tr. at 137-38.

Defendants waived their opportunity to meet their burden by waiving the evidentiary hearing as to their motion to dismiss.  This left the district court with only conclusory, otherwise unsupported allegations in the pleadings.  On this record, the district court was correct to deny the motion to dismiss the superseding indictment for want of *any* supporting evidence.

## II.  MOTION TO SUPPRESS TITLE III INTERCEPTIONS

Defendants moved to suppress the fruits of the government's Title III wiretap.  In support, they argued that the affidavit in support of the Title III application contained deliberate misstatements and omissions, the application failed to show the necessity of a wiretap, and the interception procedures were not properly minimized.

A hearing on this motion was held before trial.  FBI Special Agent David Morgan, who had given the affidavit supporting the Title III application, testified for the government.  Defendants cross-examined Special Agent Morgan, but presented no evidence of their own.  At the close of the hearing, the district court denied the motion from the bench.

4

**A. Alleged Misstatements and Omissions in Title III Application**

To suppress Title III intercepts based on misstatements and/or omissions in the underlying affidavit, a defendant must show by a preponderance of the evidence that (1) the misstatements or omissions were deliberately or recklessly made, and (2) but for those misstatements or omissions, the affidavit would lack the requisite probable cause to sustain the warrant. *See United States v. Charles*, 138 F.3d 257, 263 (6th Cir. 1998) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

After reviewing the pleadings before it and the evidence presented at the pretrial hearing, the district court found:

> There is nothing . . . no evidence whatsoever, zero, nothing to indicate that the agent intentionally misrepresented anything in the affidavit. In fact, it was just the opposite. When he was asked to explain different areas that at least were viewed by the defense listeners as something that may not quite have been a hundred percent accurate in the affidavit, he did thoroughly and completely explain it.

Suppression Tr. at 135.

Based on the testimony of Special Agent Morgan and the record before the court, this finding was not clearly erroneous. The only error in the affidavit is the mistaken identification of the surveillance targets (who are from Bangladesh) as Arab and not Asian — an error Special Agent Morgan attributed to his own ignorance. Even were it otherwise, the mistaken ethnic origin of the targets does not go to probable cause and thus was not grounds for suppression.

**B. Necessity**

Title III surveillance may be authorized only if (1) "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," and (2) an application includes a "a full and complete statement" to this effect. 18

U.S.C. § 2518(3)(c), (1)(c). Nevertheless, "the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *United States v. Giacalone*, 853 F.2d 470, 480 (6th Cir. 1988) (quoting *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988)). "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Alfano*, 838 F.2d at 163-64 (quotation omitted).

After reviewing the pleadings, the affidavit in support of surveillance, and Special Agent Morgan's testimony, the district court concluded that the surveillance was sufficiently necessary. Our independent review of the record confirms this result.

The original affidavit and Special Agent Morgan's testimony each detail that, at the time of the Title III application, traditional investigative techniques — confidential informants, pen registers, trap and trace devices, physical surveillance — had already been used and now ceased to yield results. Aside from electronic surveillance, those methods which remained — using undercover agents or a grand jury investigation — were unlikely to uncover the information the FBI was after and, moreover, risked tipping off the targets to the investigation. On these facts the district court properly concluded that the necessity requirement had been satisfied.

## C. Minimization Procedures

Title III requires that surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). To warrant suppression for want of proper minimization, defendants must show that "monitoring agents exhibited a high disregard for [defendants'] privacy rights or that they did not do all they reasonably

6

could to avoid unnecessary intrusions." *United States v. Feldman*, 606 F.2d 673, 679 (6th Cir. 1979).

Special Agent Morgan testified that all persons involved in the instant surveillance read the original minimization order and attended a briefing where the minimization procedures were discussed. Additionally, two agents involved in the surveillance were charged with seeing that the procedures were followed. Although many unrelated foreign language calls were initially intercepted, this was required because the topic of the calls could only be determined by a translator after-the-fact.

The district court concluded that defendants' allegations about improper minimization were unfounded, a finding that we conclude, reviewing the record then before the court, was not clearly erroneous.

### III. MOTION TO SUPPRESS STATEMENTS MADE DURING EXECUTION OF SEARCH WARRANT

Abrar appeals the district court's denial of his motion to suppress statements he made to Special Agent Morgan during the execution of a search warrant at his home, statements giving rise to a later criminal charge for lying to a federal agent. Abrar proceeds on the theory that he was "in custody" and therefore required warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966).

The district court held a pretrial hearing on the motion. Special Agent Morgan testified for the government. Short of cross-examination of Special Agent Morgan, Abrar offered nothing in response. On the stand, Special Agent Morgan described the execution of the search warrant and the interview as follows.

Approximately twelve FBI agents arrived at Abrar's home to execute the warrant. Following

standard protocol, the entry team wore raid jackets, bulletproof vests, and had their weapons drawn; however, the weapons were holstered and the raid clothing was removed once the house was secured. Special Agent Morgan was not part of the entry team, instead arriving later, dressed in a business suit with his weapon hidden. He explained the warrant to Abrar and asked him if they could talk. Abrar agreed and the two spoke in a sitting area near the front entrance of the home. During the interview, Abrar was not handcuffed, his movement was not restricted, and nothing was recorded. Abrar was initially nervous, but later grew relaxed. The interview was interrupted at multiple points by agents executing the warrant. After each interruption, Special Agent Morgan asked Abrar if he wished to continue and, each time, Abrar agreed. In all, the interview lasted about forty-five minutes to an hour. At no point did Abrar seek to end the discussion or ask for a lawyer.

On these facts, and in the absence of any countervailing evidence presented by the defense, the district court denied Abrar's motion to suppress. Ruling from the bench, the court explained:

> I wouldn't even characterize it as an interrogation. And [Abrar] was not in custody at the time, there is no evidence that he was in custody, at all, and there is no evidence that he did anything other than voluntarily have a discussion with the agents when they were executing the search warrant.
>
> So at least from the evidence I have before me at this time, there is no reason to suppress any statement he made at that time.

Suppression Tr. at 128-29. We agree that Abrar was not in custody and that his statements should not be suppressed.

## IV. PROSECUTORIAL MISCONDUCT

Defendants identify five instances of purported prosecutorial misconduct in the record. Where, as here, the prosecutor's comments were made without a contemporaneous objection, review

8

is for plain error. *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994). Under this standard, reversal is warranted only in "exceptional circumstances" where the error is so plain that "the trial judge and prosecutor were derelict in countenancing it." *Id.* (quoting *United States v. Mendez-Ortiz*, 810 F.2d 76, 78 (6th Cir. 1986)); *see also Girts v. Yanai*, 501 F.3d 743, 759 (6th Cir. 2007) (under plain error review, relief warranted only where prosecutorial misconduct "exceptionally flagrant"). None of the examples defendants point to rises to the level of prosecutorial misconduct.

At trial, the government played several recorded conversations between Abdelqader and Abrar. In one such recording, Abdelqader discusses funneling some money to Hamas militants in Palestine for jihad. Later, when Abrar was on the stand, defense counsel characterized the discussion as being about "sending money to charities overseas," to which the government responded, "Objection. Jihad." Trial Tr. at 2523. Without any effort by defendant at the trial to raise an objection or explain prejudice or assert misconduct, it is impossible on the record for us to find "flagrant" misconduct. We do not find evidence to support an inference that defendants were convicted because they were Muslims, or that the prosecutor's comment was aimed at obtaining such convictions rather than correcting a perceived misstatement.

Abrar testified that there were no questions about quarterly tax returns for the Al Ihsan School and the firm, arguably suggesting that *no one* claimed they were in error. This contradicted extensive testimony by three separate government witnesses that those returns omitted thousands of dollars in unreported wages, resulting in a wealth of unpaid taxes. The government thus objected to Abrar's statement, stating "[t]hat's flat wrong." Trial Tr. at 2553. As before, the government's objection was triggered by Abrar's perceived misstatements. Nevertheless, perjury is not a valid ground for objection. Instead, the proper response would have been to impeach Abrar on cross-

9

examination by referring to evidence already in the record. For this reason, the comment could be considered improper and the court should have overruled the objection. The comment does not, however, rise to the level of having been flagrant. Although deliberate, the comment was isolated, bore little risk of prejudicing or misleading the jury, and was of minor importance relative to the overwhelming evidence of guilt in this case.

During the closing argument, the prosecutor told a joke about an accountant. In it, an accountant is asked "what's 2 plus 2," to which he replies, "what do you want it to be?" *Id.* at 2696-97. The joke was not improper. It was merely a glib characterization of the evidence presented at trial, which included numerous examples of defendants' lowering clients' income figures and payroll numbers to avoid tax, and inflating clients' numbers to make them appear more profitable to secure loans.

Later in the closing, the prosecutor referred to the elaborate measures that defendants took to conceal evidence of their wrongdoing, namely omitting their names and the firm's letterhead from any fraudulent documents and immediately deleting excess copies. Implying that this suggested defendants' knowledge about the criminal nature of their actions, the prosecutor likened the practice to Watergate, noting "[i]t is not the crime; it is the coverup." *Id.* at 2757. Given the evidence presented at trial, this was a viable analogy and the comment was not improper.

At various points throughout the trial, the government claimed that its case originated when it was contacted by an informant who revealed the fraudulent practices of the firm. Defendants claim that this statement is misleading, and counter that it was the government who sought out an informant against the firm. This claim is baseless. In their briefs on appeal, defendants elsewhere concede that the case originated when a recent convict (Luftawi) informed the government about the

10

firm's fraudulent business practices in hopes of getting a reduced sentence.

## V. JUDICIAL BIAS

Defendants argue that the district court exhibited bias for the government. Where, as here, no objection was made to the conduct at issue, the claim is reviewed only for plain error. *United States v. Owens*, 159 F.3d 221, 227 (6th Cir. 1998).

Judicial interjections are "common and proper when there is a need for clarification in a lengthy or complex trial, when the witness proffers incredible testimony that is not adequately probed by counsel, or when the witness has become confused." *United States v. Glover*, 21 F.3d 133, 137 (6th Cir. 1994) (quoting *United States v. Seago*, 930 F.2d 482, 492 (6th Cir. 1991)). A trial judge "may analyze the evidence, comment upon it, and express his . . . views with regard to the trial testimony of the witnesses." *Seago*, 930 F.2d at 492 (quoting *United States v. Murdock*, 290 U.S. 389, 394 (1933), *overruled on other grounds*, *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 77 (1964)). In so doing, however, judges must exhibit "impartiality in demeanor as well as in actions." *United States v. Frazier*, 584 F.2d 790, 794 (6th Cir. 1978).

For the following reasons, none of defendants' purported examples of misconduct constitutes judicial bias, much less that which would require reversal for plain error. The first alleged example of judicial bias arose during cross-examination of Loretta Abassi, a former principal of the Al Ihsan School, by Abrar's attorney. Attempting to show that false tax forms had been filed because the originals were seized during the execution of a search warrant, counsel asked Abassi whether documents necessary for her return had been seized. Finding the question improper (presumably in that it calls for speculation), the government objected. Before the objection was recorded, however, Abassi responded that she did not know. Accordingly, the court responded to the objection by

11

saying, "She answered it. She wouldn't know." Trial Tr. at 1188. This statement did not favor the prosecution, but only reiterated a fact — that Abassi did not know whether certain documents were seized — and therefore does not show judicial bias.

Later in the trial, the district court instructed Abrar's attorney to stop playing a tape recording which had become inaudible. Counsel had argued that the recording was of an argument between Abdelqader and his estranged wife, presumably supporting his theory that Abdelqader was attempting to hide money from his wife through the cash-for-checks scheme. Initially, the court allowed counsel to play the recording, but when it became inaudible, the court ordered it to be stopped. The record reflects that, when asked, the jurors indicated that they could not hear or understand the tape recording. On appeal, defendants offer nothing to dispute the fact that the recording had indeed become inaudible to all in the courtroom. The judge's order therefore cannot be considered biased.

During the government's proof, several witnesses testified that, after Abrar discovered that he was under investigation, Abrar issued 1099 forms (used to report income to independent contractors) to employees of the firm and Al Ihsan School to supplement their W-2 forms (used to report income to employees) which, by his design, had previously understated their earnings. When asked about this on cross-examination by the government, Abrar responded that his misuse of 1099s did not obstruct justice and results only in a small fine. The prosecutor responded by asking rhetorically whether willfully filing a wrongful tax document — here, the 1099s — was a felony under 26 U.S.C. § 7206(1). Defense counsel objected, but the court overruled, stating "I think it is." *Id.* at 2642. This comment favored the government but was nonetheless necessary to prevent Abrar from misleading the jury about the law. This did not show judicial bias.

12

The final alleged instance of judicial bias took place during re-cross examination of Abrar by Rashid's attorney. Counsel asked Abrar whether Rashid "reported per your instruction every cent of income that he received." *Id.* at 2689. The government objected, to which the court responded, "I don't know." *Id.* The government did not state the basis for its objection, but on appeal claims that the question called for speculation. Regardless of the nature of the objection, the judge's comment did not amount to judicial bias. If anything, it exhibited uncertainty which was thereafter resolved when Abrar went on to answer the question in the affirmative.

## VI. JURY INSTRUCTIONS

Defendants argue that the district court's instructions to the jury were deficient.[1] Specifically, they claim that the district court failed to instruct the jury about (1) entrapment, (2) *Pinkerton* liability, (3) judicial notice, and (4) character. They further claim (5) that the instructions about liability under RICO were contradictory, and (6) that the instruction about informant testimony was defective. Defendants also raise several additional claims which are totally unsupported by the record.

Before trial, the district court gave defendants a copy of proposed jury instructions, to which no written or stated objections were made. After reading the instructions to the jury, the court again asked defendants if they wished to make "any objections, modifications, additions or deletions to the instructions." *Id.* at 2886. Counsel for each of the three defendants replied in the negative.

Where no contemporaneous objection to the jury instructions is made, this court reviews for plain error. *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006); *see also* Fed. R. Crim. P.

---

[1]Several of the arguments about jury instructions apply only to a particular defendant. When applicable, this is noted below.

13

30(d), 52(b). The plain error exception to the contemporaneous-objection rule is to be used "sparingly." *See United States v. Young*, 470 U.S. 1, 15 (1985). It applies only where the jury instructions were "so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Combs*, 33 F.3d 667, 669 (6th Cir. 1994).

For the reasons that follow, none of the alleged errors rises to the level of plain error.

## A. Entrapment

Abrar claims that he deserved an entrapment jury instruction. Entrapment has two elements: "government inducement" and "lack of predisposition." *Mathews v. United States*, 485 U.S. 58, 63 (1988). A defendant must present evidence to satisfy both elements to receive an entrapment instruction. *See United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990).

Nothing in the record suggests that the government did anything more than provide Abrar opportunity to commit an offense. On Abdelqader's first visit to the firm, Abrar agreed to falsify his tax return without incident. Later, when Abdelqader expressed interest in substantiating off-the-books cash income, Abrar immediately agreed and, moreover, suggested ways to do so. On these facts, one cannot say that the government did anything more than provide opportunities to commit the offenses. Therefore, it was not plain error for the district court not to give an entrapment instruction.

## B. *Pinkerton* Liability

Akram claims that, at various points during the alleged conspiracies, he was out of the country and therefore could not be held liable for the acts of his co-conspirators during those times. On this ground, he argues that he deserved an instruction under *Pinkerton v. United States*, 328 U.S. 640 (1946). A *Pinkerton* instruction informs the jury that a conspirator is liable for substantive

offenses of his co-conspirator(s) in furtherance of the conspiracy, unless and until he formally withdraws from the conspiracy.

Presumably, Akram believes the *Pinkerton* instruction would have reminded the jury that a conspirator is not liable for wrongs of his co-conspirators after his withdrawal. This argument fails for two reasons. First, Akram never advanced the theory that his absence from the forum was proof of withdrawal. And second, even if he had, it would have been legally insufficient proof. Withdrawal from a conspiracy is an affirmative defense requiring evidence of affirmative termination, usually in the form of a full confession to authorities or communication to co-conspirators that one has abandoned a conspiracy and its goals. *See United States v. Chambers*, 944 F.2d 1253, 1265 (6th Cir. 1991); *Brown v. United States*, 261 F. App'x 865, 866 (6th Cir. 2008); *United States v. Mann*, 195 F. App'x 430, 435 (6th Cir. 2006). On these facts, the omission of a *Pinkerton* instruction was not plain error.

## C. Judicial Notice

During the pretrial suppression hearing, the district court took judicial notice of the fact that "we all want to pay the least amount of tax we have to," so as to avoid prolonged questioning on the subject. Suppression Tr. at 89. The district court later forgot to instruct the jury on this fact. Defendants claim this rises to plain error.

That taxpayers normally want to pay the least amount of taxes owed is axiomatic. The failure to remind the jury of this fact cannot be said to be "so clearly erroneous as to likely produce a grave miscarriage of justice." *Combs*, 33 F.3d at 669. The failure was not plain error.

## D. Character

Rashid argues that he was entitled to a jury instruction about his good character. Although

15

Rashid elicited testimony from witnesses about his piety and good standing in the community, he cites nothing to support the proposition that a district court should, of its own volition, instruct a jury about the good character of a defendant, much less that the failure to do so is plain error.

## E. RICO Instructions

Defendants argue that the district court's instructions about the elements of the RICO conspiracy were irreconcilable with its general admonition to the jury not to let its findings about one defendant or charge influence its verdicts as to another.

The district court instructed the jurors that:

> [Y]ou must decide whether the Government has presented proof beyond a reasonable doubt that a particular Defendant is guilty of a particular charge. Your decision on any one Defendant or one charge, whether it is guilty or not guilty, should not influence your decision on any of the other Defendants or charges.

Trial Tr. at 2833-34.

Later, while setting out the elements of a RICO conspiracy, the district court instructed the jury that a guilty verdict required, *inter alia*, a finding:

> [T]hat the Defendant deliberately joined or became a member of the conspiracy or agreement with knowledge of its purpose, agreeing that a member of the conspiracy, not necessarily himself, would conduct or participate in the affairs of the enterprise through a pattern of racketeering activity and the commission of at least two acts of racketeering activity.

*Id.* at 2838.

These instructions are not inconsistent. The former instructs the jury not to let its opinions about guilt or innocence of any one defendant (or, as to any one charge) color its views about the others. The latter explains that, in the limited context of a RICO conspiracy, the commission of a

16

predicate act of racketeering activity is imputed to each member of the conspiracy provided that the member to whom it is imputed specifically joined the conspiracy and agreed to the commission of the act in furtherance thereof.

### F. Informant Testimony

Defendants argue that the district court erred in instructing the jury about the testimony of paid informants. On this subject, the district court attempted to follow the Sixth Circuit pattern instructions. *See id.* at 2826; Sixth Circuit Pattern Jury Instruction No. 7.06A. At one point, however, the judge mistakenly instructed the jury to consider the testimony of paid informants with "the *same* caution of testimony from any of the other witnesses," and not "*more* caution," as is stated in the pattern instructions. *See* Trial Tr. at 2826; Sixth Circuit Pattern Jury Instruction No. 7.06A. The government asserts that this is a transcription error, but it is impossible to verify such a claim. We thus presume that the trial transcript is accurate in depicting this error

Under the pattern jury instructions, jurors are to consider testimony from paid informants with greater scrutiny. Here, the instructions given failed to make this point and thus constituted error. Nevertheless, that error, standing alone, is unlikely to have "produce[d] a grave miscarriage of justice," given the overwhelming evidence of guilt in this case. *Combs*, 33 F.3d at 669. Therefore, it does not rise to the level of plain error.

### G. Remaining Claims

Defendants also argue that the district court erred in failing to instruct the jury about the elements of mail and wire fraud, the materiality requirement vis-à-vis fraud counts, the ability to accept or reject expert testimony, and the good faith defense to tax offenses. These claims are baseless. The record establishes that each of these instructions were given.

## VII. VALIDITY OF MONEY LAUNDERING AND RICO CONVICTIONS AFTER *UNITED STATES V. SANTOS*

Defendants argue that Abrar's money laundering convictions must be vacated under *United States v. Santos*, 128 S.Ct. 2020 (2008), and, consequently, that defendants' RICO convictions must also be vacated because Abrar's money laundering offenses were alleged as RICO predicates. This argument was not advanced below and was therefore waived, subject only to plain error review. *See United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008).

In *Santos*, the Supreme Court addressed the meaning of the term "proceeds" as it is used in the federal money laundering statute. The court held that, in a case alleging money laundering arising out of an illegal gambling operation, the rule of lenity required that "proceeds" be interpreted to mean profits and not simple receipts. *Santos*, 128 S.Ct. at 2025. A four-member plurality of the Court would apply that rule in all cases. *Id.* Concurring in the judgment, Justice Stevens favored applying the rule on a case-by-case basis, based on the nature of the activity that produced the laundered funds. *See id.* at 2029 n.7 (Stevens, J., concurring in the judgment).

Given the conflicting opinions, the meaning of *Santos* as applied to this case is uncertain. We observe, however, that Abrar's money-laundering convictions were based on the laundering of proceeds, or represented proceeds, from others' illegal sales of stolen cigarettes, and there was no claim that the proceeds, or represented proceeds, were not profits. Against this backdrop, the district court did not commit plain error by failing to instruct the jury *sua sponte* that proceeds meant profits.

## VIII. SUFFICIENCY

Defendants argue that there was insufficient evidence to support their convictions, claims reviewed under the "rational trier" standard set out in *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

18

But where "a defendant does not renew his motion for judgment of acquittal for insufficiency of the evidence at the close of all the proofs, appellate review is limited to determining whether there was a 'manifest miscarriage of justice.'"[2] *United States v. Price,* 134 F.3d 340, 350 (6th Cir. 1998). A "miscarriage of justice" exists only if the record is "devoid of evidence pointing to guilt." *Id.*

### A. Abrar

Abrar challenges his conviction for wire fraud arising out of his misrepresentation of the firm's gross receipts to Wells Fargo Bank in order to get an increased line of credit for his business. In a recorded conversation, Abrar told a Wells Fargo representative that the firm's receipts were about $400,000. In reality, the firm's receipts were but $162,500. First, he argues that the conviction cannot stand because Wells Fargo suffered no loss. Second, he argues that the indictment charged him with receiving a $100,000 line of credit, but that the Wells Fargo representative testified that his line of credit was only $60,000. As to the first claim, actual loss is not an element of wire fraud. *See United States v. Ames Sintering Co.*, 927 F.2d 232, 235-36 (6th Cir. 1990). As to the second, the actual figure is irrelevant given the testimony that the line of credit offered — whatever it may be — was larger because of the false claims about the firm's receipts.

Abrar challenges his convictions of aiding and abetting wire fraud by providing false pay stubs to Ameed Abuzahrieh so that he could secure a mortgage and car loan. At trial, Abuzahrieh testified that he bought false pay stubs from Abrar which showed that he earned $600 a week from C. Kuni Oil and later used them in preparing documents to secure a $200,000 mortgage and a car

---

[2]Akram and Rashid respectively moved for judgments of acquittal under Federal Rule of Criminal Procedure 29 at the close of the government's case-in-chief, but they neglected to renew their motions at the close of all the evidence. Abrar made no Rule 29 motions.

loan. The government also introduced the actual pay stubs and a recorded conversation between Abuzahrieh and Abrar concerning the arrangement. This evidence was sufficient to establish that the pay stubs overstating income were instrumental to securing the loans at issue, and that Abrar intentionally aided the plan.

Abrar challenges his convictions for aiding and abetting wire fraud in connection with preparing documents for Nihad Doleh which understated his income in order to receive undeserved financial assistance towards his daughter's college tuition. The evidence at trial established that for the school years 2003-04, 2004-05, and 2005-06, Doleh understated his income on federal financial aid forms using documentation provided by the firm which resulted in the award of Pell and Supplemental Educational Opportunity Grants which would have been denied were his true income reported. Additionally, Doleh testified that, when approached about preparing the false federal aid forms, Abrar not only agreed to help but also suggested the fictitious amount of income to claim. This evidence is more than adequate to support Abrar's conviction.

Abrar challenges his conviction for health care fraud on the ground that the government never proved that the beneficiary of the fraud — his wife — was not entitled to benefits under the subject Medicaid program. This claim is not supported by the record. At trial, a representative of the Department of Employment and Family Services, responsible for administration of the local Medicaid program, testified that, *inter alia*, eligible recipients must be United States citizens and that, on his wife's form, Abrar checked the box indicating that she was a citizen. The government then submitted proof that Abrar's wife has never been a citizen of the United States. This is sufficient to uphold his conviction.

**B.  Akram and Rashid**

Akram and Rashid both challenge their convictions for conspiracy to defraud the United States, RICO conspiracy, and for submitting false information on their income tax returns. Akram and Rashid concede the existence of the conspiracies, but challenge their convictions on the ground that they did not know about or join into them. In this regard, they place great emphasis on the fact that, unlike Abrar, they were not trained accountants and did not give independent accounting advice.

Evidence of Akram's knowledge of and participation in the conspiracies is overwhelming. Among other things, during his time at the firm, Akram prepared false pay stubs for Marwan Mustafa and, in a recorded conversation, discussed not wanting to "get caught"; prepared false income documents for Hani Otallah and later discussed the misstatements in a recorded conversation with Abrar; took an order for false pay stubs from Ameed Abuzahrieh; produced an amended tax return with inflated numbers to help Shadi Faraj secure a bank loan; and discussed producing false pay stubs for Hatem Idies so that she could qualify for certain medical benefits.

The evidence presented at trial also supported the government's contention that Rashid knew about and actively participated in the conspiracies. A former coworker testified that Rashid handled the payment of city taxes and assisted in matters with the Al Ihsan School. The evidence at trial demonstrated that, in each capacity, Rashid had knowledge of the firm's illicit activity. During two recorded conversations between Rashid and Abrar, Rashid discussed underreporting clients' sales figures in order to lessen the amount they owed in local sales tax. The government also presented evidence that Rashid delivered fraudulent "split" paychecks to employees at the Al Ihsan School. To minimize the amount of official payroll and thereby lessen payroll tax, school employees were given two paychecks: a computer-generated, official paycheck that would ultimately be reported, and a handwritten, unofficial paycheck that would not. Aside from his work with city taxes and the

21

school, Rashid was recorded having numerous conversations about the production of false pay stubs, which betrayed his knowledge of the criminal enterprise.

On these facts, the record is certainly not "devoid of evidence pointing to guilt" relative to Akram and Rashid's knowledge and participation in the two conspiracies. *See Price*, 134 F.3d at 350. As to the tax charges, Abrar and Rahsid concede the existence of various errors on their personal income tax returns but maintain that they were merely innocent mistakes of omission or misunderstanding, and not of the "willful" variety that render such errors criminal. These claims are wholly unsupported by explanation or argument in their briefs on appeal. For the tax years 2001 through 2003, Akram filed as head-of-household and took dependent exemptions and related credits for Abrar's daughter. For the tax years 2000, 2001, 2003, and 2004, Akram underreported his wages from the firm by $6,578, $4,804, $6,892, and $2,239, respectively. What is more, under the terms of his limited religious worker visa, Rashid was prohibited from maintaining any employment in the United States other than the religious work contemplated by the visa (here, teaching at the Al Ihsan School). To hide the source of what little of the firm's income he did report, Rashid disguised the money by declaring it on a Schedule C form which stated he was merely a clergyman.

## IX. MOTION FOR NEW TRIAL

The jury returned its verdict on October 16, 2006. Defendants filed their motion under Rule 33 on January 2, 2007. The motion does not purport to rely on newly discovered evidence. Its filing was thus untimely, missing the applicable seven-day filing window by over two months. The law is clear that courts lack discretion to consider untimely Rule 33 motions. *See Carlisle v. United States*, 517 U.S. 416, 421 (1996). Therefore, the district court's denial of the motion was not an abuse of discretion.

22

## X.  REASONABLE SENTENCE

Abrar challenges the reasonableness of his sentence.  Specifically, he argues that the district court improperly accepted the government's allegation of loss amounts for his crimes, did not adequately consider the sentencing factors set out in 18 U.S.C. § 3553(a), did not articulate the reasons for not departing downward, did not resolve a question about the applicability of a mandatory minimum sentence, improperly increased his sentence based on judge-found facts, and failed to address all objections to the presentence report on the record.  We have stated that we review for both procedural and substantive reasonableness. *United States v. Conatser*, 514 F.3d 508, 519 (6th Cir. 2008).

### A.  The Sentencing Hearing

Abrar was sentenced on January 9, 2007.  At the outset, the district court noted that the adjusted offense level for Abrar's most serious crimes was 32, which reflected increases for the amount of loss associated with the offenses, his leadership role, abuse of a special skill in the commission of the offense, and obstruction of justice.  Combined with Abrar's lack of criminal history, this produced an advisory guidelines range of 121 to 151 months.

Defense counsel argued for a below-Guidelines sentence based on Abrar's standing in the community.  The government argued for an above-Guidelines sentence based on Abrar's complete lack of remorse and acceptance of responsibility in facilitating the crimes of his co-defendants.  For his own part, Abrar asked for mercy, describing himself as a "pawn" and accepting responsibility only for having allowed others to take advantage of his "honesty and unsuspecting demeanor."

The district court found that the extensive support for Abrar from his community and his responsibility to his family weighed in favor of a low sentence.  But the judge added that these

23

factors were offset by Abrar's misuse of his expertise (accounting), extensive perjury on the stand (as suggested by the jury verdict, which rejected Abrar's claims entirely), and considerable responsibility for the downfall of his co-defendants who, because of his criminal acts, were now convicted felons and, in some cases, risked deportation as a result. Above all, though, the judge was struck by Abrar's complete lack of remorse or acceptance of responsibility in the face of overwhelming evidence of wrongdoing. Taking all the factors together, the court reasoned:

> I will consider all of the positive things that you have done, . . . [but] there is an argument to go above the Guidelines . . . because of all the work and all the damage that you did to all these people that have now been convicted of felonies because of the enterprise that you set up and operated, [but] I'm not going to [go above the Guidelines] because I, I think that . . . the sentence that I am going to impose is sufficient but not greater than necessary to comply with all the dictates of the law.

Sentencing Tr. at 31.

The court went on to sentence Abrar to 144 months' imprisonment — near the middle of the 121 to 151 month Guideline range — for RICO conspiracy, conspiracy to commit money laundering, money laundering (two counts), wire fraud (four counts), mail fraud, and bank fraud. The judge sentenced Abrar to 120 months' imprisonment for money laundering (two remaining counts), interstate transport of property taken by fraud, fraudulent misuse of visas, and healthcare fraud. For conspiracy to defraud the United States and making false statements to a federal officer, the court sentenced Abrar to 60 months' imprisonment. And for making and subscribing false statements on his personal income tax returns, the firm's tax returns, and Al Ihsan School tax returns, the court sentenced Abrar to 36 months' imprisonment. All of the sentences were to run concurrently, with three years' supervised release at their conclusion.

24

**B. Loss Amount**

Abrar argues that his sentence was procedurally unreasonable because the $249,000 amount of loss associated with the tax offenses was excessive.[3] This objection was addressed on the record and rejected by the district court. It found that, "listening to all the testimony, and especially the agent's testimony on the computations," the government figure is "conservative . . . and so I think that those numbers are correct." *Id.* at 19. This conclusion is supported by the record. At trial, an IRS revenue agent and an FBI Special Agent (who, as a certified public accountant, specialized in accounting) each testified to the purported amount of loss. Reliance on this testimony in accepting the alleged amount of loss was not clearly erroneous and, therefore, was not procedurally unreasonable under *Gall v. United States*, 128 S.Ct. 586, 591 (2007).

**C. § 3553(a) Factors**

Abrar claims that the court did not adequately consider the sentencing factors set out in 18 U.S.C. § 3553(a). This claim is contradicted by the record. The district court explicitly referred to § 3553 in stating that it was not bound by the Guidelines, and later reiterated the statute's mandate that the sentence be sufficient, but not greater than necessary. Although the district court did not read the § 3553 factors into the record, this is not required.

**D. Reasons for Departing Downward**

Abrar next argues that the district court committed procedural error by not explicitly stating

---

[3]As an aside, Abrar suggests that the loss calculation was in error because it assumed a 28% tax loss for all unreported wages. This was done in accordance with the Sentencing Guidelines on the subject. *See* U.S.S.G. § 2T1.1(c)(1)(A) ("If the offense involved filing a tax return in which gross income was underreported, the tax loss shall be treated as equal to 28% of the unreported gross income (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made.").

its reasons for rejecting a downward variance from the advisory Guidelines range. This argument is unavailing. The record indicates that the district court *did* consider reasons for downward variance, only to find them offset by countervailing reasons for upward variance.

### E. Applicability of Mandatory Minimum

At the start of the sentencing proceeding, Abrar questioned the judge about the applicability of a mandatory minimum, asserting his belief that none applied. The judge opined that the applicable minimum was 120 months, but tempered his response by adding that they would formally address the subject later in the proceeding. The topic, however, was never revisited. Nor did Abrar or his counsel request the court to do so.

Abrar suggests that this omission taints the entire proceeding. Although the issue was unresolved, the judge's comments from later in the proceeding reflect that he did not feel bound by any statutory minima or Guidelines ranges. To the contrary, he referred to *Booker* and § 3553 in commenting on the considerable breadth of his discretion. On these facts, it is impossible to conclude that the omission constituted error, much less that it prejudiced Abrar.

### F. Use of Judge-Found Facts and Objections to the Presentence Report

The two remaining claims are interrelated. First, Abrar argues that the judge impermissibly increased his sentence based on judge-found facts in violation of *Blakely v. Washington*, 542 U.S. 296 (2004) and *United States v. Booker*, 543 U.S. 220 (2005). Second, he argues that the judge failed to discuss all of his written objections to the presentence report on the record.

The Sixth Circuit has held that sentencing courts may use judge-found facts, proved by a preponderance of the evidence, in setting an advisory Guidelines range — provided that the resulting range does not exceed the statutory maximum authorized by the jury verdict. *See United States v.*

26

*Coffee*, 434 F.3d 887, 898 (6th Cir. 2006); *United States v. Stone*, 432 F.3d 651, 654-55 (6th Cir. 2005).[4]  Under this framework, the upward adjustment of Abrar's advisory Guidelines sentence range based on judicial findings about Abrar's leadership role in the crimes, the amount of loss attributable to his crimes, abuse of a specialized skill (accounting), and obstruction of justice (based on perjury) was not procedural error.

Likewise, the Sixth Circuit has said that a sentencing court's decision not to address every sentencing argument in detail is not error.  *See United States v. Gale*, 468 F.3d 929, 940 (6th Cir. 2006) (citing *United States v. Cunningham*, 429 F.3d 673, 678 (7th Cir. 2005), for proposition that sentencing courts need not "discuss every argument made by a litigant; arguments clearly without merit can, and for the sake of judicial economy should, be passed over in silence.").  That is particularly true in this case in which defendants have raised a multitude of claims, many of which are frivolous.

## XI.  SUPPLEMENTAL ARGUMENTS IN *PRO SE* BRIEFS

Defendants themselves have filed a total of eleven pro se briefs in addition to the briefs filed by their lawyers.  Most issues raised by defendants in these briefs echo claims already asserted by their attorneys in the opening briefs.  Several claims that are not redundant are addressed below. Claims not addressed are entirely without merit.

### A.  Abrar

Abrar claims that the district court had no jurisdiction over him because of an alleged Speedy

---

[4]Some judges disagree with this reading of the law, *see*, *e.g*, *United States v. Thompson*, 515 F.3d 556, 569 (6th Cir. 2008) (Merritt, J., dissenting), and *United States v. Phinazee*, 515 F.3d 511, 521 (6th Cir. 2008) (Merritt, J., dissenting), and the Supreme Court arguably has not finally resolved the issue.

Trial Act violation. This argument was not raised before trial and is therefore waived on appeal. *See* 18 U.S.C. § 3162(a)(2); *United States v. White*, 985 F.2d 271, 274-75 (6th Cir. 1993).

Soon after beginning deliberations, the jury notified the court that several government exhibits had been mistakenly omitted from their materials. After a brief conference *in camera* with all the parties, the court decided to submit the missing materials without objection. Abrar challenges this sequence of events on three grounds. First, Abrar claims that he was improperly excluded from the *in camera* conference. Abrar's counsel did not object to his absence and his presence was not required under the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 43(b)(3) (defendant's presence not required for conferences or hearings on points of law). Second, Abrar claims that supplemental instructions to the jury were required on providing the missing exhibits. There is no authority for this proposition. And third, Abrar argues that the transcript from the *in camera* conference is incomplete because it refers to actions which took place off the record in violation of 28 U.S.C. § 753. Specifically, at the start of the transcribed proceedings, the court noted that the parties have retrieved the missing exhibits for review. That the decision to get a copy of the exhibits for the purposes of the *in camera* conference was not recorded verbatim in the record is of no consequence and Abrar cites nothing to suggest otherwise.

Abrar disputes his money laundering conviction on the ground that the district court omitted the name of one of the alleged co-conspirators, Omar Abedrabbo, in reciting the count to the jury. Abrar suggests that the omission was deliberate, but presents no evidence to this effect and fails to explain why the omission was relevant. Because there was no objection on this point below, plain error review applies and nothing in the record suggests that this error was "likely produce a grave miscarriage of justice." *Combs*, 33 F.3d at 669.

28

The government presented evidence that all conversations between Abrar and Abdelqader were surreptitiously recorded with Abdelqader's consent. On one or two occasions, though, there was an equipment malfunction and conversations were not recorded as result. Abrar alleges that these malfunctions were orchestrated by the government to withhold exculpatory conversations. There is nothing in the record to corroborate these claims and counsel did not raise any objections to the malfunctions at trial.

In response to Abrar's counsel following the court's order to stop playing a recorded conversation between Abdelqader and his estranged wife which had become inaudible, *supra*, the district court took judicial notice of the fact that Abdelqader was having marital problems. The court later forgot to instruct the jury on this point, without comment or objection by Abrar or his counsel. This omission was clearly not a sufficiently "grave miscarriage of justice" to justify reversal. *Id.*

## B. Rashid

At one point during the trial, the government attempted to show that certain unsigned tax documents had been prepared by defendants by reference to a "digital fingerprint" which indicated that the documents had been prepared with software in use at the firm. Rashid challenges this practice and cites various cases on reasonable doubt. His precise argument is difficult to follow, but it seems to suggest that this evidence was insufficient to prove guilt and/or that it was improperly admitted.

Standing alone, this evidence would be insufficient to convict Rashid. For reasons already stated, however, the evidence presented at trial, taken as a whole, was sufficient to convict him. Claims about relevance are similarly unavailing. Evidence about the presence of a mark on these documents indicating that they had been prepared using software in the possession of defendants is

29

certainly relevant and admissible under the rules of evidence.  *See* Fed. R. Evid. 401, 403.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.